### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

Margo Chambers

    v.

Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration

Civil No. 16-cv-087-LM
Opinion No. 2016 DNH 187

### O R D E R

Pursuant to 42 U.S.C. § 405(g), Margo Chambers moves to reverse the Acting Commissioner's decision to deny her application for Social Security disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423.  The Acting Commissioner, in turn, moves for an order affirming her decision.  For the reasons that follow, the decision of the Acting Commissioner, as announced by the Administrative Law Judge ("ALJ"), is affirmed.

### I. Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of
social security disability benefits unless 'the [Acting
Commissioner] has committed a legal or factual error in
evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS,
76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v.
Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting
Commissioner's findings of fact be supported by substantial
evidence, "[t]he substantial evidence test applies not only to
findings of basic evidentiary facts, but also to inferences and
conclusions drawn from such facts." Alexandrou v. Sullivan, 764
F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,
360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial
evidence is 'more than [a] mere scintilla.  It means such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d
594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402
U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the
[Acting Commissioner] to determine issues of credibility and to
draw inferences from the record evidence.  Indeed, the
resolution of conflicts in the evidence is for the [Acting
Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS,

955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted).  Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material Facts.  That statement, document no. 9, is part of the court's record and will be summarized here, rather than repeated in full.

In March of 2011, Chambers' primary care provider ("PCP") referred her to Dr. John Grobman "for evaluation of left nondominant shoulder pain and arm numbness."  Administrative Transcript (hereinafter "Tr.") 187.  In his first office note after the referral, Dr. Grobman described the history of Chambers' condition:

> [B]ack in October [of 2010], she was just stretching
> her arm up overhead.  She felt some sort of a pop and
> then couldn't lower her arm.  . . .  It got better,

3

> although it probably took a couple of months to get
> better.  She has had some minor reinjuries with just
> normal activities.
>
> She gets complaint of a dull ache in the posterior
> shoulder, which goes down to the hand and fingers on
> the left and feels that she has lost strength. She is
> not able to reach up behind her.  Her husband has been
> having to fasten her bra for her and reaching back to
> put on a seat belt and that sort of thing is painful
> as well.

Tr. 187.  Based on his review of an MRI, Dr. Grobman diagnosed

Chambers with "cervical stenosis and foraminal stenosis [at] C5-

6 and C6-7."[1]  Tr. 188.  Dr. Grobman also wrote:

> I've acquainted [Chambers] with the fact that she is
> at some risk of spinal cord injury should [her]
> stenosis problem get worse or should she be subjected
> to a whiplash-type injury.  . . .  I have informed her
> that given her young age that . I think she probably
> will require single or two-level decompression and
> fusion.

Id.  As of July 24, 2014, Chambers had not had surgery for her

cervical spine condition, and the record does not appear to

include any subsequent diagnostic imaging, which would document

the progression, if any, of her stenosis problem.

After diagnosing Chambers, Dr. Grobman referred her to Dr.

Glen Lieberman, who diagnosed her as being "neurologically

intact" and as having "what appears to be symptomatic disc

osteophyte complexes at C5/6, C6/7 in the subaxial cervical

---

[1] Stenosis is "[a] stricture of any canal or orifice."
Stedman's Medical Dictionary 1832 (28th ed. 2006).

spine."[2]   Tr. 189.   He prescribed Vicodin and referred Chambers to Dr. Jan Slezak for cervical epidural steroid injections. Chambers had two such injections in May and July of 2011.   In May of 2011, Dr. Lieberman reported that Chambers had "done well enough that [he] discharge[d] her" with the proviso that he would "see her on an as needed basis."   Tr. 190.   It does not appear that Chambers ever saw Dr. Lieberman again.

In June of 2011, Chambers left her job as an accounting clerk for the New Hampshire Department of Corrections ("DOC"). At the hearing that finalized the decision of the Social Security Administration ("SSA") to deny her application for benefits, she described the end of her DOC job this way:

> Q   And you quit the job?
>
> A   I had to.
>
> Q   Okay.
>
> A   They said one good slip, one good fall, I'd be looking at a wheelchair.
>
> Q   Okay.
>
> A   And I was around inmates so they didn't think it would be a very good environment for me.

Tr. 33.

---

[2] An osteophyte is "[a] bony outgrowth or protuberance." Stedman's, supra note 1, at 1391.

In July of 2012, Chambers visited Laconia Cardiology, P.A., complaining of "major neck issues," Tr. 221, and seeking to establish care with a PCP.  On that visit, she was seen by Stacy Breau, a nurse practitioner, who gave her an assessment of neck pain and recommended a follow-up visit in two months' time. Chambers saw Nurse Breau twice more: (1) in August of 2012 for a "follow-up of her neck stenosis," Tr. 224; and (2) in February of 2013, "for a refill on her vicodin," Tr., 222.  On both occasions, Nurse Breau gave Chambers a physical examination.

In March of 2013, Chambers applied for Social Security disability insurance benefits.  She was last insured for DIB on December 31, 2012.  At her hearing, she offered conflicting testimony about whether she became unable to work before her eligibility for DIB expired.  When asked whether she could work eight hours a day, five days a week, in 2012, she responded: "Back then, yeah.  Now?  No."  Tr. 46.  Shortly thereafter, however, she testified that in December of 2012, she needed to lie down for two or three hours, nearly every day, to relieve her pain, and that her pain prevented her from concentrating well enough to do her former work as an accountant.

In July of 2014, Chambers first saw Dr. Mary-Claire Paicopolis, a cardiologist associated with Laconia Cardiology. Dr. Paicopolis diagnosed Chambers with cervical disk disease and

prescribed Vicodin for pain control.  In her initial treatment note, Dr. Paicopolis wrote: "[T]he patient cannot work at this time."  Tr. 241.  Dr. Paicopolis saw Chambers again in February of 2014, and in her note on that visit, she wrote: "No way the patient can go back to work."  Tr. 239.

The notes prepared by Nurse Breau and Dr. Paicopolis show that Chambers was given several physical examinations, but no testing related to her cervical disk disease.  Her treatment was limited to prescriptions for Voltaren and Vicodin.

In conjunction with the February 2014 office visit, Dr. Paicopolis completed a Physical Residual Functional Capacity ("RFC") Questionnaire on Chambers.[3]  In it, she indicated that she had treated Chambers for one year, identified a diagnosis of spinal stenosis/degenerative disc disease, and gave this prognosis: "need[s] spine surgery."  Tr. 231.  When asked to identify the clinical findings and the objective signs supporting her opinions on Chambers' RFC, Dr. Paicopolis wrote: "see orthopedic notes."  Id.  It is not clear what orthopedic notes Dr. Paicopolis was referring to.

With regard to exertional limitations, Dr. Paicopolis opined that Chambers could not walk even one block without rest

---

[3] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

or severe pain, could sit for five minutes at a time before needing to get up, could stand for 15 minutes before needing to sit down, and could sit and stand/walk for a total of less than two hours in an eight-hour working day.  She also opined that Chambers needed to walk around for 15 minutes every 15 minutes, needed a job that permitted shifting positions at will from sitting to standing and/or walking, needed 15 minute breaks every 15 minutes, and could lift and carry less than 10 pounds occasionally, 10 pounds rarely, and never any more than that. Dr. Paicopolis identified similarly restrictive postural and manipulative limitations.[4]  She also opined that Chambers' pain would frequently interfere with attention and concentration, that she was incapable of even low stress jobs, and that she was likely to be absent from work more than four days a month as a result of her impairment.  Finally, Dr. Paicopolis opined that Chambers' impairment had lasted, or could be expected to last, at least twelve months, and that the symptoms and limitations she identified in the RFC Questionnaire began in 2010.

The record includes a Disability Determination Explanation ("DDE") form.  In lieu of a function-by-function RFC assessment

---

[4] Specifically, she opined that Chambers could: (1) occasionally look down, turn her head, look up, hold her head in a static position, and climb stairs; (2) rarely twist; and (3) never stoop, crouch/squat, climb ladders, grasp/turn/twist objects, perform fine manipulations, or reach.

by a state agency medical consultant, such as those typically
reported on DDE forms, the DDE form in Chambers' case includes a
statement by Cheryl Searles, who is a single decisionmaker
("SDM").[5]  According to Searles: "Although there is some evidence
in [Chambers'] file, it is not sufficient to make a
determination for disability for the period in question."  Tr.
59.

    After the SSA denied Chambers' application for benefits,
she received a hearing before an ALJ.  At the hearing, the ALJ
asked a vocational expert ("VE") to characterize Chambers'
previous work according to the exertional and skill levels
stated in the Dictionary of Occupational Titles.[6]  He next
acknowledged Searles' notation on the DDE form concerning the
lack of evidence in the file, and stated: "Well, I'm going to
work from the evidence that I have."  Tr. 50.  Then the
following exchange took place between the ALJ and the VE:

---

[5] "A single decisionmaker is an employee of the Social
Security Administration who has no medical credentials."
Chambers v. Colvin, No. 15-cv-150-JL, 2016 200 614405, at *4
(D.N.H. Feb. 16, 2016) (citing Stratton v. Astrue, 987 F. Supp.
2d 135, 138 n.2 (D.N.H. 2012); Goupil v. Barnhart, No. 03-34-P-
H, 2003 WL 22466164, at *2 n.2 (D. Me. Oct. 31, 2003)).

[6] "The [Dictionary of Occupational Titles] is published by
the United States Department of Labor, and the SSA regulations
designate it as a source of vocational evidence for use in
making disability determinations."  Regalado v. Colvin, No. 15-
cv-299-PB, 2016 WL 4775525, at *4 n.7 (D.N.H. Sept. 14, 2016)
(citing 20 C.F.R. § 404.1560(b)(2)).

Q  Let's first look at a range of sedentary exertional work, allowing for an alternation of sitting and standing every 30 minutes, with occasional postural activities such as stooping, crouching, crawling, climbing of ramps and stairs, no climbing of ladders, ropes and scaffolds, frequent balancing and no crawling.  No difficulties with manipulative limitations.  A need to avoid unprotected heights, in close proximity to dangerous machinery.  And for the moment let's leave it at that.  Given that hypothetical, would the claimant be able to perform any of her past work?  I guess we'd specifically be looking at the accounting clerk work since it's the only sedentary job in the list.

A  As generally performed in the economy, yes, Your Honor.

Q  Okay.  But not as actually performed given the—

A  Yes, as actually performed.

Tr. 50-51.  Finally, the ALJ indicated that if Chambers were subject to the limitations that Dr. Paicopolis identified in her RFC Questionnaire, and in particular a need to miss more than four days of work a month, Chambers would be entirely precluded from working.

After the hearing, the ALJ issued a decision that includes the following relevant findings of fact and conclusions of law:

3.  Through the date last insured, the claimant had the following severe impairment: degenerative disc disease of the cervical spine (20 CFR 404.1520(c)).

. . . .

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of

the listed impairments in 20 CFR Part 404, Subpart P,
Appendix 1 (20 CFR 404.1520(d), 404.1525 and
404.1526).

. . . .

5.   After careful consideration of the entire record,
I find that, through the date last insured, the
claimant had the residual functional capacity to
perform sedentary work as defined in 20 CFR
404.1567(a) allowing her to alternate between sitting
and standing every thirty minutes; never climb
ladders, ropes, or scaffold[s], or crawl but could
occasionally climb ramps or stairs, stoop, kneel, or
crouch and frequently balance; and a need to avoid
unprotected heights or close proximity to dangerous
moving machinery.

. . . .

6.   Through the date last insured, the claimant was
capable of performing past relevant work as an
accounting clerk.  This work did not require the
performance of work-related activities precluded by
the claimant's residual functional capacity (20 CFR
404.1565).

Tr. 14, 15, 19.

### III. Discussion

A. The Legal Framework

To be eligible for disability insurance benefits, a person
must: (1) be insured for such benefits; (2) not have reached
retirement age; (3) have filed an application; and (4) be under
a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question
in this case is whether Chambers was under a disability from

11

June 7, 2011, through December 31, 2012, which is the date on
which she was last insured for DIB.

For the purpose of determining eligibility for disability
insurance benefits,

> [t]he term "disability" means . . . inability to
> engage in any substantial gainful activity by reason
> of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a
> disability only if [her] physical or mental impairment
> or impairments are of such severity that [she] is not
> only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in
> which [she] lives, or whether a specific job vacancy
> exists for [her], or whether [she] would be hired if
> [she] applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which
> exists in the national economy" means work which
> exists in significant numbers either in the region
> where such individual lives or in several regions of
> the country.

42 U.S.C. § 423(d)(2)(A).

To decide whether a claimant is disabled for the purpose of
determining eligibility for disability insurance benefits, an
ALJ is required to employ a five-step process.  See 20 C.F.R. §
404.1520.

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is

denied; 2) if the [claimant] does not have, or has not
had within the relevant time period, a severe
impairment or combination of impairments, the
application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that she is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the claimant or other witness; and
> (3) the [claimant]'s educational background, age, and
> work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

B. Chambers' Claims

Chambers claims that the ALJ erred in determining her RFC by: (1) giving weight to the opinion of a single decisionmaker; (2) improperly rejecting the opinion of her treating physician; and (3) basing his RFC assessment on his own lay interpretation of raw medical data.  In addition, she claims that the ALJ's faulty RFC assessment fatally undermines his Step 4 determination and that the ALJ performed a Step 4 analysis that was procedurally flawed.  None of Chambers' claims warrants a reversal of the ALJ's decision.

1. Cheryl Searles' "Opinion"

In his decision, the ALJ stated that he "considered the opinion of State examiner Cheryl Searles, SDM, who opined that there is insufficient evidence to make a determination for disability during the period in question" and that he "afford[ed] her assessment limited weight as she is not an acceptable medical source."  Tr. 17.  Chambers claims that the ALJ committed reversible error by giving any weight at all to Searles' opinion because Searles is not an acceptable medical source, which means that the ALJ was not permitted to base his RFC determination on her opinion.

Indeed, "[i]t appears to be well settled that an RFC assessment by a SDM does not qualify as substantial evidence on

which an ALJ may rely when making an RFC assessment." Stratton v. Astrue, 987 F. Supp. 2d 135, 152 (D.N.H. 2012) (citing Cunningham v. Astrue, No. 09-2535-SAC, 2010 WL 4737795, at *4 (D. Kan. Nov. 16, 2010) ("An SDM is not a medical professional of any stripe, and the opinion of an SDM is entitled to no weight as a medical opinion, nor to consideration as evidence from other non-medical sources."); see also Chambers v. Colvin, No. 15-cv-150-JL, 2016 WL 614405 (D.N.H. Feb. 16, 2016) (citations omitted). The problem with claimant's reliance upon the rule stated in Stratton is her erroneous characterization of "Ms. Searles' non-medical assessment [as] the sole RFC evaluation completed on behalf of the state agency." Doc. no. 7, at 4. Searles did not assess Chambers' RFC, and the DDE form contains no RFC assessment of any sort. While the ALJ did refer to giving limited weight to Searles' "opinion," the ALJ did not base his RFC determination on an assessment by a SDM because the SDM in this case made no RFC assessment. Thus, notwithstanding the ALJ's unfortunate reference to Searles' statement as an "opinion," Chambers' first claim of error fails.

## 2. Dr. Paicopolis's Opinion

Chambers next argues that "[t]he ALJ . . . rejected [Dr. Paicopolis's] opinion without good cause for doing so." Doc. no. 7, at 5. The court does not agree.

15

Under the applicable SSA regulations, medical opinions from a claimant's treating sources are generally entitled to greater weight than opinions from medical sources who have merely examined the claimant and sources who have neither treated nor examined her.  See 20 C.F.R. § 404.1527(c)(1).  Those regulations further provide that

> [i]f [an ALJ] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).  Here, the ALJ noted that "Dr. Paicopolis provided limited support or citations to the record to support her profound limitations to a very restricted range of part-time sedentary work activity."  Tr. 18.  That finding, which is based on an accurate characterization of the record, amply supports the ALJ's decision not to give controlling weight to Dr. Paicopolis's opinion.

When an ALJ does not give controlling weight to a treating source's opinion, he must determine the amount of weight to give that opinion by considering: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treating relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the

record as a whole; (5) the medical specialization of the source offering the opinion; and (6) any other factors that may support or contradict the opinion.  See 20 C.F.R. § 404.1527(c)(2)-(6). In his decision, the ALJ determined that Dr. Paicopolis's opinion was entitled to limited weight because: (1) "she has only treated the claimant on two occasions over approximately one year and thus lacks a longitudinal treatment history with the claimant or knowledge of her impairments dating back to her alleged onset date in June 2011," Tr. 18;[7] (2) Dr. Paicopolis is a cardiologist, while Chambers' purportedly disabling impairment is degenerative cervical disk disease;[8] and (3) Dr. Paicopolis's opinion is not supported by her own treatment notes.  As required by 20 C.F.R. § 404.1527(c)(2), the ALJ gave good reasons for giving limited weight to Dr. Paicopolis's opinion.

---

[7] The ALJ also points out that Dr. Paicopolis opined that Chambers' complete inability to work began in 2010, which is at least 30 months before Dr. Paicopolis first saw Chambers, 18 months before Chambers first began treating at Laconia Cardiology, and five months before she stopped working.  The fact that Chambers worked at her DOC accounting job for the first five months of 2011 calls into question the reliability of Dr. Paicopolis's opinion that Chambers became incapable of working in 2010.

[8] Regarding Dr. Paicopolis's specialization in cardiology, the court agrees with Chambers that Paicopolis is an acceptable medical source, see 20 C.F.R. § 404.1513(a)(2), but also agrees with the ALJ that as medical specialties go, cardiology would offer relatively few insights into the functional effects of degenerative cervical disk disease.

In arguing to the contrary, claimant points out that while she first saw Dr. Paicopolis in July of 2013, she began seeing Dr. Paicopolis's Laconia Cardiology colleague, Nurse Breau, in July of 2012, while she was still insured for DIB.[9]  Even if Nurse Breau's treatment relationship with Chambers is attributed to Dr. Paicopolis, the fundamental problem identified by the ALJ, lack of support in the treatment records, still remains.

As the court has noted, neither Nurse Breau nor Dr. Paicopolis reported the results of any "medically acceptable clinical [or] laboratory diagnostic techniques" related to Chambers' degenerative cervical disk disease.  20 C.F.R. § 404.1427(c)(2).  Beyond that, to the extent that they examined Chambers, they had little to say about her disk disease. Breau's note of July 2, 2012, reports no exam findings at all. Her note of August 27, 2012, reports no exam findings related to disk disease.  Her note of February 18, 2013, reports: "She has decreased [range of motion] and stiffness in her neck.  She has tenderness to palpation along her cervical neck and a small amount of spasm."  Tr. 243.  After Dr. Paicopolis examined Chambers in July of 2013, she gave the following report:

> Physical Examination:  Vital Signs:  Blood Pressure:
> 134/83.  Heart rate:  102.  O2 Saturation:  97%.

---

[9] The court also notes that July of 2012 is approximately 13 months after the date on which Chambers claims to have become disabled.

18

> Weight:  179 lbs, down from 187 lbs.  Neck:  No JVD.
> Chest:  Clear to auscultation.  Heart:  Regular rate
> and rhythm.  Extremities:  Warm without edema.[10]

Tr. 240.  After Dr. Paicopolis examined Chambers in February of
2014, she gave the following report:

> Physical Examination:  Vital Signs:  Blood Pressure:
> 139/89.  Heart rate: 110.  O2 Saturations:  98%.
> Weight:  165 lbs, down from 179 lbs.  Neck:  No JVD.
> Chest:  Clear to auscultation.  Heart:  Regular rate
> and rhythm.  Abdomen:  Soft and nontender.
> Extremities:  Warm without edema.

Tr. 239.  Based upon the foregoing, the court has no difficulty
concluding that substantial evidence supports the ALJ's
determination that Dr. Paicopolis's opinion is not well
supported by the Laconia Cardiology treatment notes.

Chambers' only argument to the contrary is that her "MRI
results, revealing severe cervical stenosis, provide direct
support for Dr. Paicopolis' treating source opinion."  Doc. no.
7, at 6.  Dr. Paicopolis mentioned that MRI in her initial
treatment note,[11] but did not expressly mention it in her RFC

---

[10] JVD is an "[a]bbreviation for jugular venous distention."
Stedman's, supra note 1, at 1019.

[11] Dr. Paicopolis wrote: "She had an MRI of her spine which
showed degenerative disease of her neck, a disk bulge, cervical
neck, and severe bilateral neuroforaminal compromise, left
greater than right."  Tr. 240.

Questionnaire.[12]  But, in any event, while the MRI supports Dr.
Paicopolis's diagnosis of degenerative cervical disk disease,

> [m]edical diagnoses, such as "bulging disc," and
> "cervical spine with mild degeneration, no evidence of
> significant neurologic impingement," are "medical
> labels which carry no readily discernible message
> about the physical capacities of an individual
> suffering from the conditions they denote." Class
> Rosario v. Secretary of Health & Human Services, 1990
> WL 151315 at *2 (1st Cir. July 16, 1990).

Gobis v. Colvin, No. 15-cv-268-SM, 2016 WL 4257546, at *5
(D.N.H. Aug. 12, 2016) (citations to the record omitted) (citing
McKenzie v. Comm'r, SSA, 215 F.3d 1327, 2000 WL 687680 at *5
(6th Cir. May 19, 2000) (unpublished table decision) ("[T]he
mere diagnosis of an impairment does not render an individual
disabled nor does it reveal anything about the limitations, if
any, it imposes upon an individual.")).  As Judge McAuliffe
explained in Gobis, "the United States District Court for the
District of Massachusetts has noted [that] '[f]or Social
Security disability purposes, the issue is not whether an
impairment exists, but whether it is sufficiently severe to
prevent work.'"  2016 WL 4257546, at *5 (quoting Stefanowich v.
Colvin, No. Civ. No. 13-30020-KPN, 2014 WL 357293, at *1 (D.

---

[12] On reflection, the court notes that Dr. Paicopolis's
cryptic reference to "orthopedic notes" could plausibly be
interpreted as a reference to the MRI, but even if it is, Dr.
Paicopolis does nothing more than refer to the MRI, and
certainly does not explain how it supports her opinions.

Mass. Jan. 30, 2014)).  The MRI on which claimant relies

supports Dr. Paicopolis's diagnosis but not her RFC assessment.

In sum, the ALJ's determination that Dr. Paicopolis's

opinion is entitled to little weight is supported by substantial

evidence, and provides no basis for a remand.  Thus, Chambers'

second claim of error fails.

### 3. The ALJ's RFC

Chambers' third claim of error is that when the ALJ

determined her RFC without the support of an opinion from an

acceptable medical source, he necessarily based that

determination on his lay interpretation of raw medical data,

which is impermissible.  While claimant correctly states the

applicable law, the legal principles on which she relies do not

apply to the circumstances of this case.

"[S]ince bare medical findings are unintelligible to a lay

person in terms of residual functional capacity, the ALJ is not

qualified to assess residual functional capacity based on a bare

medical record." Gordils v. Sec'y of HHS, 921 F.2d 327, 329

(1st Cir. 1990) (per curiam) (citations omitted).  Thus, "an

expert's RFC evaluation is ordinarily essential unless the

extent of functional loss, and its effect on job performance,

would be apparent even to a lay person." Santiago v. Sec'y of

HHS, 944 F.2d 1, 7 (1st Cir. 1991) (per curiam); see also Manso-

Pizarro, 76 F.3d at 17 (citing Perez v. Sec'y of HHS, 958 F.2d 445, 446 (1st Cir. 1991)). This case falls comfortably within the Santiago exception to the rule stated in Gordils.

According to claimant, this case is analogous to McLaughlin v. Colvin, No. 14-cv-154-LM, 2015 WL 3549063 (D.N.H. June 8, 2015), in which this court remanded because the ALJ gave limited weight to a treating source opinion and then determined, without the benefit of another opinion from an acceptable medical source, that the claimant had the RFC for light work. The problem with claimant's reliance on McLaughlin is that the court is hard pressed to identify any raw medical data that the ALJ interpreted to determine Chambers' RFC.

Rather than being analogous to McLaughlin, this case has much more in common with Haskell v. Colvin, No. 13-cv-482-JL, 2015 WL 419663, at *2 (D.N.H. Feb. 2, 2015), in which Judge Laplante ruled that the ALJ permissibly rendered a commonsense judgment about functional capacity based upon medical records showing that the claimant had made a small number of minor complaints to his doctor about physical limitations, and Bergeron v. Astrue, No. 11-cv-395-PB, 2012 WL 2061700, at *8 (D.N.H. June 7, 2012), in which Judge Barbadoro ruled that the ALJ's consideration of medical evidence showing steady progress

toward recovery "did not amount to interpretation of raw data from the medical record."

In the final analysis, this is not so much a case about an ALJ interpreting raw medical data as it is a case in which an applicant for disability insurance benefits has failed to carry her burden of producing evidence that she is disabled.  Given that paucity of evidence, the court cannot agree that the ALJ impermissibly relied upon lay interpretation of raw medical data to determine Chambers' RFC.  To the contrary, he rendered a commonsense judgment based on the extreme thinness and generally benign character of Chambers' medical records.  Thus, Chambers' third claim of error fails.

### 4. Step 4

Chambers claims that the ALJ erred in two different ways at Step 4, by basing his Step 4 finding upon VE testimony that was given in response to a hypothetical question containing a flawed RFC and by performing a procedurally deficient Step 4 analysis. Neither part of Chambers' claim is meritorious.

When an ALJ's Step 4 determination rests upon an erroneous RFC presented to a VE in a hypothetical question, that determination is not supported by substantial evidence, which requires a remand.  See Arocho v. Sec'y of HHS, 670 F.2d 374, 375 (1st Cir. 1982) ("in order for a vocational expert's answer

to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities"); Marshall v. Colvin, No. 14-cv-239-PB, 2015 WL 248615, at *4 (D.N.H. Jan. 20, 2015). However, given the court's determination that the ALJ did not err in assessing Chambers' RFC, the first part of her Step 4 claim fails. See Reynolds v. Colvin, No. 14-cv-439-LM, 2015 WL 2452718, at *8 (D.N.H. May 22, 2015).

The second part of Chambers' Step 4 claim is no more persuasive. In Reynolds, this court outlined the applicable legal principles:

> "At step four the initial burden is on the claimant to show that she can no longer perform her former work because of her impairments." Manso-Pizarro, 76 F.3d at 17 (citing Santiago v. Sec'y of HHS, 944 F.2d 1, 5 (1st Cir. 1991)). Specifically, the claimant must: (1) "produce relevant evidence of the physical and mental demands of her prior work," Santiago, 944 F.2d at 5; and (2) "describe those impairments [that] preclude[ ] the performance of [that] particular job," id. If the claimant is able to do so, then "the ALJ must compare the physical and mental demands of that past work with current functional capacity." Id. (citing 20 C.F.R. § 404.1560(b)).

2015 WL 2452718, at *8; see also Social Securing Ruling 82-62/Program Policy Statement 80, 1982 WL 31386, at *4 (S.S.A. 1982) (describing mechanics of Step 4 determinations).

In Reynolds, the court rejected the claimant's argument "that the ALJ committed reversible error at step four by . . .

failing to conduct her analysis in conformance with Social
Security Rulings 82-61 and 82-62," because the claimant had not
met her initial burden of showing that she could no longer
perform her former work.  See id.  The court reached that
conclusion based upon the claimant's hearing testimony, in which
she did not say that she could not perform her former work but,
rather, said only that she did not know whether she would be
able to perform that work or not.

Like the claimant in Reynolds, Chambers faults the ALJ for
failing to compare the demands of her past work with her current
functional capacity.  He did not need to do so.  Chambers,
unlike the claimant in Reynolds, did actually testify that
before her insured status expired on December 21, 2012, she was
unable to meet the demands of her previous work.  Specifically,
she said was that she was unable to do that work due to pain
from her disk disease.  But, the ALJ carefully considered
Chambers' symptoms and found that her "statements concerning the
intensity, persistence, and limiting effects of [her] symptoms
[were] not entirely credible."  Tr. 16.  Chambers does not
challenge the ALJ's assessment of the credibility of her
statements about the limiting effects of her pain.[13]  Because

---

[13] While the circumstances of this case do not call upon the
court to evaluate the ALJ's determination that Chambers'
statements about her symptoms were less than fully credible, the

those statements are the only evidence Chambers pointed to in support of her claim that she became unable to work before December 31, 2012, she has failed to make the kind of showing that would have required the ALJ to perform the analysis she faults him for failing to make.  Accordingly, the second part of Chambers' Step 4 claim fails.

### IV. Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Chambers' claim, see Manso-Pizarro, 76 F.3d at 16, her motion for an order reversing the Acting Commissioner's decision, document no. 7, is denied, and the Acting Commissioner's motion for an order affirming her decision, document no. 10, is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

October 25, 2016
cc:   Penelope E. Gronbeck, Esq.
      Terry L. Ollila, Esq.

_____

court notes that the ALJ's characterization of Chambers' "objective clinical presentation [as] quite mild," Tr. 17, does appear to be supported by substantial evidence.